# COMMONWEALTH OF MASSACHUSETTS
## THE TRIAL COURT

LAND COURT
FILED

2015 SEP 24 PM 3: 06

BARNSTABLE, SS.

LAND COURT DEPARTMENT
CIVIL ACTION NO.

15 MISC 000386

---

)
PAUL G. JOUBERT; BEVERLY HAND; )
JEANNE EKASALA; PASQUALE TETI AS )
TRUSTEE OF THE 5 WHITE CAP REALTY )
TRUST; THE TRUSTEE OF THE WHITE )
CAP CONDOMINIUM ASSOCIATION; )
MAUREEN L. SHEEHAN AS TRUSTEE OF )
THE MAUREEN L. SHEEHAN TRUST; PAUL )
SCHNEIDER AND SHARON SCHNEIDER, )
AS TRUSTEES OF THE DIANE REALTY )
TRUST; VASILIOS POULOS, AS TRUSTEE )
OF THE VASILIOS POULOS REVOCABLE )
INTERVIVOS TRUST; IRENE DAVIS; )
DARRELL DAVIS; and THE MANAGING )
BOARD OF THE SANDWICH SHORES )
CONDOMINIUM ASSOCIATION, )
)
    Plaintiffs, )
)
v. )
)
TOWN OF SANDWICH, MASSACHUSETTS; )
FRANK PANNORFI, RALPH A. VITACCO, )
SUSAN JAMES, R. PATRICK ELLIS, AND )
PETER BEAUCHEMIN, AS MEMBERS OF )
THE TOWN OF SANDWICH BOARD OF )
SELECTMAN, )
)
    Defendants. )

---

## VERIFIED COMPLAINT

**INTRODUCTION**

1.     The purpose of this complaint and motion for preliminary injunction is to stop the Town of Sandwich (the "Town") from acting out of spite to re-direct the planned placement of beach nourishment sand on Town Neck Beach to a location that is <u>downdrift</u> (further east) of homeowners in imminent peril of losing their homes from severe storm erosion—all because those homeowners refused the Town's request that they "donate" easements *in perpetuity* as a condition to receiving 150,000 cubic yards of sand to be dredged from the Cape Cod Canal by the Army Corps of Engineers (the "Corps") under the so-called §204 program of the Water Resources Development Act, and placing it on Town Neck Beach.

2.     The request for a permanent injunction seeks to have the Town place that sand in the planned original location as defined and justified on a benefit/cost and best practice basis by the Corps in its §204 Report, by the Town's consultant, and by the Board of Selectmen— namely, in the area just east of the Cape Cod Canal ("Canal"), so that the sand gradually moves downdrift throughout the entire Town Neck Beach system, successively protecting the entire shorefront, including the Town-owned Town Neck Beach, Plaintiffs' homes that abut this beach, and the sand dunes along the shoreline.

3.     Town Neck Beach is a public beach, acquired by the Town by eminent domain in 1909. Plaintiffs are private property owners whose properties abut Town Neck Beach. Because the Town has failed to maintain and nourish its beach over decades, Town Neck Beach has severely eroded by 300 feet, resulting in the destruction of this shoreline, including Plaintiffs' properties.

4.     The erosion of Town Neck Beach has significantly increased over the last three years because of severe storm events that because of the Town's lack of maintenance and

nourishment of the public beach, have resulted in the Plaintiffs losing significant portions of their lots. With the storm season approaching, Plaintiffs are faced with the inevitable loss of additional property, and their homes are in imminent danger of being washed away or rendered uninhabitable because their septic systems are compromised.

5. In February of this year, the Town was presented with the possibility that if the §204 Report were to conclude that there is a positive benefit/cost ratio to the Corps' placement of the sand dredged from the Canal as beach fill on the 2500-foot eroded section of Town Neck Beach where Plaintiffs' homes are located, compared with the alternative of dredging and dumping the sand in the ocean at a disposal site in Cape Cod Bay (the "Federal base plan"), then the additional cost above the Federal base plan to place the sand on Town Neck Beach from the planned dredging of the Canal would be shared between the Federal government and the Town at a 65% and 35% ratio respectively.

6. The Town told the Corps that even if the §204 Report did not find a positive benefit/cost ratio, the Town nevertheless was willing to pay 100% of any additional costs over and above the Federal base plan (i.e., the cost for the Corps to dredge and dump the sand in a disposal site in Cape Cod Bay) in order to have the sand placed on a severely eroded 2500-foot section of Town Neck Beach.

7. The Corps completed the §204 Report in June of this year and the report concluded that there was, in fact, a positive benefit/cost ratio to undertaking a beach nourishment project for Town Neck Beach using the sand scheduled to be dredged from the Canal in November of this year.

8. In order to implement this §204 beach nourishment project, however, the Town requested that Plaintiffs "donate" to the Town easements *in perpetuity* purportedly to

"maximize" the beach nourishment project design on Town Neck Beach. The majority of private property owners whose properties abut Town Neck Beach were not required to donate permanent easements. Plaintiffs refused to give up a property right in perpetuity for a "temporary" project, and neither the Town nor the Corps could cite to any statute, regulation or written policy that required the Plaintiffs to give permanent easements in their properties in exchange for a one-time placement of beach nourishment sand from the planned dredging of the Canal.

9.  In addition to there being no basis in law for requiring permanent easements of Plaintiffs for a one time placement of sand on Town Neck Beach based on the Corps' plan to dredge the Canal in November, there is no basis in fact for this requirement since the beach nourishment plan can be implemented through the Plaintiffs' grant of *temporary* easements for the period of time necessary for the Canal-dredged sand to be placed on Town Neck Beach— easements Plaintiffs repeatedly offered to give, but were rejected by the Town.

10. Because of Plaintiffs' refusal to grant easements to the Town in perpetuity, the Board of Selectmen have now decided to pay the full cost of the sand ($1.7 million) and, vindictively, to place the sand further east on Town Neck Beach, away from Plaintiffs' abutting properties, telling Plaintiffs: "No land, No sand."

11. Without the placement of sand on Town Neck Beach in accordance with the carefully designed §204 Plan, Plaintiffs' beachfront homes are in danger of being washed away by the next major storm event. The Town's willingness to place sand on Town Neck Beach in accordance with the §204 Plan only if Plaintiffs agree to relinquish a fundamental property interest, violates their rights under the unconstitutional conditions doctrine.

12. Under pressure from the Board of Selectmen, and without any beach nourishment "plan" before it, nor any technical or public benefit justification for placing the sand downdrift of the Plaintiff homeowners, the Town's Community Preservation Committee ("CPC") voted to authorize the use of an additional $1.2 million in Community Preservation Act ("CPA") funds to purchase the Canal-dredged sand from the Corps.

13. Based on information and belief, the Town has just signed a Memorandum of Agreement ("MOA") with the Corps and has deposited, or will deposit, $1.7 million to the account of the Corps to purchase the Canal-dredged sand and have it placed in the new location, downdrift of Plaintiffs' homes.

14. Based on information and belief, within the next three weeks, the Corps will issue bid documents and award contracts for contractors to commence work in November to dredge the Canal and place the dredged sand in the new, re-directed location downdrift of Plaintiffs' properties.

15. Unless an injunction is granted that restrains the Town from placing sand on Town Neck Beach further east of Plaintiffs' properties, their homes are in imminent danger of being severely damaged and/or washed out to sea by the next major storm event.

## JURISDICTION AND VENUE

16. This Court has jurisdiction over this matter pursuant to Mass. Gen. Laws c. 185, §1, as this dispute concerns the right, title or interest in registered land in Sandwich, Barnstable County, Massachusetts.

## PARTIES

17. Plaintiff Paul G. Joubert is an individual who resides at 1 Bay Beach Lane, Sandwich, Massachusetts, which is registered land.

18.     Plaintiff Beverly Hand is an individual who resides at 1 Bay Beach Lane, Sandwich, Massachusetts, which is registered land.

19.     Plaintiff Jeanne Ekasala is an individual who resides at 5 Bay Beach Lane, Sandwich, Massachusetts, which is registered land.

20.     Plaintiff Pasquale Teti, in his capacity as Trustee of the 5 White Cap Realty Trust, is an individual who resides at 5 White Cap Path, Sandwich, Massachusetts, which is registered land.

21.     Plaintiff Pasquale Teti, as Trustee of the White Cap Condominium Trust, is the duly-appointed representative of the organization of unit owners at the White Cap Condominium, a residential community of three units established by Master Deed recorded with the Barnstable Registry District of the Land Court as Document Number 802202, under By-Laws of the Association recorded with said Registry as Document Number 802203.

22.     Plaintiff Maureen L. Sheehan, in her capacity as Trustee of the Maureen L Sheehan Trust, is an individual who resides at 3 Bay Beach Lane, Sandwich, Massachusetts, which is registered land.

23.     Plaintiffs Paul and Sharon Schneider, as Trustees of the Diane Realty Trust, are individuals who reside at 2 White Cap Path, Unit #4, Sandwich, Massachusetts, which is registered land.

24.     Plaintiff Vasilios Poulos, as Trustee of the Vasilios Poulos Revocable Intervivos Trust, is an individual who resides at 2 White Cap Path, Unit #6, Sandwich, Massachusetts, which is registered land.

25.     Plaintiffs Irene Davis and Darrell Davis are individuals who reside at 2 White Cap Path, Unit #8, Sandwich, Massachusetts, which is registered land.

26.     Plaintiff Managing Board of the Sandwich Shores Condominium Association is the duly-elected representative of the organization of unit owners at the Sandwich Shores Condominium, a residential community of 4 units established by Master Deed recorded with the Barnstable Registry District of the Land Court as Document Number 211971, under By-Laws of the Association recorded with said Master Deed.[1]

27.     Defendant Town of Sandwich is a municipality existing under the laws of the Commonwealth of Massachusetts, with a principal place of business located at the Town Hall Annex, 145 Main Street, Sandwich, Massachusetts ("Town" or "Sandwich").

28.     Defendant Board of Selectman is an instrumentality of the Town of Sandwich with a principal place of business located a Town Hall, 130 Main Street, Sandwich, Massachusetts (the "Board"). The Board serves as the chief policy-making body and executive board of the Town. The Board appoints a Town Manager to carry out the day-to-day operations of the Town and appoint members of various standing committees. The Board is responsible for setting guidelines for the preparation of the annual budget and to present the budget to Town Meeting. The Board is also responsible for setting the date and warrant articles for Town Meetings and any Special Town Meetings. The Board also serves as the licensing board for the Town.

29.     Frank Pannorfi, in his capacity as Chairman of the Board, is an individual who resides in Sandwich, Massachusetts.

30.     Ralph A. Vitacco, in his capacity as Vice Chairman of the Board, is an individual who resides in Sandwich, Massachusetts.

---

[1] Paul Schneider (President), Darrell Davis (Treasurer), and Maryellen Moore (Secretary) are the duly elected members of the Managing Board of the Sandwich Shores Condominium Association. By unanimous vote on July 22, 2015, the Managing Board voted to proceed with this litigation.

31.     Susan James, in her capacity as a member of the Board, is an individual who resides in Sandwich, Massachusetts.

32.     R. Patrick Ellis, in his capacity as a member of the Board, is an individual who resides in Sandwich, Massachusetts.

33.     Peter Beauchemin, in his capacity as a member of the Board, is an individual who resides in Sandwich, Massachusetts.[2]

## FACTS

### Town Ownership of Town Neck Beach

34.     In or about 1909, the Town took the land now known as Town Neck Beach by eminent domain for the purpose of maintaining a beach as a "Public Playground." A true and correct copy of this deed, recorded in Deed Book 298, page 122, is attached hereto as **Exhibit 1**.

35.     The land area comprising the Town-owned Town Neck Beach is shown in BLUE on the Real Estate Plan, Sheets RE-101 through RE-103 of the Beach and Dune Restoration Plan dated May 2015, prepared by the Corps, attached hereto as **Exhibit 2**.

36.     The Town has held ownership of the Town Neck Beach land for the benefit of the public since 1909.

37.     The Town, as owner of this public beach, and as a littoral property owner, has an obligation to maintain and nourish Town Neck Beach. The Town, however, has failed to do either, with the result that the Town's public beach is now under water.

38.     Beach nourishment and restoration efforts by the Town on Town Neck Beach have been so inadequate as to be virtually non-existent, and have not been sufficient to protect Town Neck Beach from severe erosion.

---

[2] The Town of Sandwich, the Board, and the Members of the Board are hereinafter collectively referred to as "the Town."

**Extent of Erosion on Town Neck Beach; Threat of Further Erosion and Damage**

39.     Because of the failure of the Town to maintain and nourish its public Town Neck Beach, the Beach has suffered dramatic erosion, with the result that in the past three years, in particular, wave action from major storm events has not only caused further erosion to the coastal bank/coastal dune but also caused damage to the homes abutting Town Neck Beach, including damage to their septic systems, and placed these homes and related structures in peril of being washed into the sea. *See* Affidavit of Norman Hayes and accompanying Erosion Study Land Plan ("Erosion Study"), attached hereto as **Exhibit 3**.

40.     In June, 2015, the Corps issued a study of erosion on Town Neck Beach in connection with its proposed placement of 150,000 cubic yards of dredged material from the Canal on Town Neck Beach pursuant to §204 of the Water Resources Development Act ("WRDA") of 1992, as amended by Section 2037 of the WRDA 2007.   That study, entitled §204 Detailed Project Report and Environmental Assessment for Beneficial Use of Dredged Materials From Maintenance Dredging (the "§204 Report") is attached hereto as **Exhibit 4**.

41.     The §204 Report, in Figures 1 and 2, identifies the 2,500 foot stretch of Town Neck Beach containing 29 shorefront lots, including Plaintiffs' homes, that have "experienced localized, acute, erosion along the beach face exposed to Cape Cod Bay," and which will sustain further damage or loss if not nourished with the dredged material.  Figures 1 and 2 depict the projected shoreline retreat in two year increments. *See* **Exhibit 4** at pp. ES-2; pp. 8-9.

42.     The §204 Report documents the fact that the "recent annual coastal erosion rate is now estimated at 5 feet per year, far in excess of the long term average for this region." *See* **Exhibit 4** at p. 8.

43.     The §204 Report further states that this new long-term erosion rate "will continue at a similar rate and eventually threaten the shorefront structures along the beach." *See* **Exhibit 4** at p. 8.

44.     In the last three years the severe storms that have caused extensive damage to Town Neck Beach and abutting coastal structures are: Tropical Storm Sandy of October 29, 2012, Nemo of February 8-10 2013, the Winter Storm of March 8-9 2013, the Winter Storm of January 3-4, 2014, Juno of January 23-30, 2015, Linus of February 3, 2015, and Neptune of February 15, 2015. *See* **Exhibit 3.**

45.     Additionally, more recent survey data on Town Neck Beach from the last three years indicate that the risk of erosion and damage from future storm events is more urgent than even the §204 Report indicates. Survey data collected on Town Neck Beach during the period of June 20, 2012 through August 31, 2015, which includes the above-referenced storm events, indicate that during this period the estimated total amount of native and borrow coastal bank/coastal dune/coastal beach material that has been lost to erosion from these storm events is approximately <u>45,550 cubic yards</u>. This figure includes beach nourishment sand that was placed on Town Neck Beach by property owners trying to protect their homes. *See* **Exhibit 3**.

46.     The Erosion Study indicates that during the period from June 20, 2012 through August 31, 2015, the amount of erosion of the coastal bank/coastal dune top, landward, was 50 linear feet across 80% of the area between Stone Groin No. 1 and Stone Groin No. 2 on Town Neck Beach, which is the area that encompasses many of the homes on Town Neck Beach. *See* **Exhibit 3**.

47.     Plaintiffs have suffered significant loss of property (land and structures) that could have been avoided had the Town implemented a program of regular maintenance and

nourishment of the public Town Neck Beach. Plaintiffs' properties are now exposed and vulnerable to further damage and loss from future storm events. If the beach nourishment sand is placed on the 2500-foot section pursuant to the §204 Plan, the nourishment and reconstruction of the dunes will delay the loss and damage of the protected properties for the expected life span of the beach fill—5 years. *See* **Exhibit 3** and Verified Complaint at ¶ 57.

48.     Based on the survey data from the Erosion Study and the above referenced series of storm events since 2012, it is projected that, without beach nourishment, erosion will continue to occur as much as another 50 linear feet to where the RED with Black dotted line is shown on the Erosion Study, which means that the homes abutting Town Neck Beach would either be destroyed or severely damaged. A single large storm event could cause loss of an <u>additional 50 feet</u> from the top of the current coastal bank/coastal dune. *See* **Exhibit 3**.

49.     The Erosion Study indicates that Groin No. 1 is separated by approximately 40 feet from the coastal bank/coastal dune. The Erosion Study also indicates that Groin No. 2 that was separated from the shoreline by 60 feet at the time of the 2012 survey, is now separated by approximately 100 feet. This means that in a storm event, water will flow through the breaches in these groins and flank the landward terminus at an accelerated rate, causing increased erosion of the coastal bank/coastal dune downdrift of each groin. *See* **Exhibit 3**.

50.     During the period from June 20, 2012 through August 31, 2015 the entire beach area has eroded <u>two (2) to eight (8) vertical feet</u> within the Erosion Study area, which creates deeper water and larger waves. These larger waves breaking on the coastal bank will cause even more rapid erosion that will result in severe damage to the homes and other structures shown in the Erosion Study area, including the compromise of septic systems, and render the homes uninhabitable. *See* **Exhibit 3**.

## §204 Beneficial Use Project for Town Neck Beach
## Town Willingness to Pay 100% of the Cost

51.     In 1956, by amendment to Title 33 U.S.C. §426e, Congress extended the policy of
Federal financial participation in the construction of shore-protection measures to protect private
property at shores of privately-owned property provided that the project would provide benefits
such as those arising from public use, or from the protection of nearby public property, or if the
benefits to those shores were incidental to the project. *See* 33 U.S.C. §426e (d).

52.     Under §204 of the WRDA, the Corps is authorized to study, design, and
implement projects to reduce hurricane and coastal storm damage to property, or for the
protection, restoration, and creation of aquatic and ecologically related habitats in connection
with the dredging of an authorized navigation project. The Corps shares in construction costs for
these types of projects.

53.     On February 2, 2015, the Corps issued a 30 Day Public Notice under the National
Environmental Policy Act ("NEPA") and Section 404 of the Clean Water Act ("CWA") of 1977
announcing the Corps' plan to work in navigable waters of the United States in order to
undertake the proposed dredging of the Canal (the "Corps Public Notice"). The Corps Public
Notice is attached hereto as **Exhibit 5**.

54.     The Corps Public Notice explained that the dredged material from the Canal could
be beneficially used as beach fill on Town Neck Beach if a study under §204 of the Water
Resources and Development Act of 1992 were to conclude that there is a positive benefit/cost
ratio to the Corps' placement of the sand dredged from the Canal as beach fill on the 2500-foot
eroded section of Town Neck Beach, compared with the alternative of dredging and dumping
the sand in the ocean at a Cape Cod Canal Disposal Site (CCCDS) in Cape Cod Bay (the
"Federal base plan"). The Corps Public Notice also explained that the additional cost above the

12

Federal base plan to place the sand on Town Neck Beach from the planned dredging of the Canal would be shared between the Federal government and the Town at a 65% and 35% ratio respectively. *See* **Exhibit 5** at p. 1 of 8.

55. The Corps Public Notice also states that the Town expressed its desire to receive the material dredged from the Canal "regardless of the outcome of the Section 204 study" and "expressed its willingness to pay 100% of any additional costs over and above the Federal base plan (i.e., dredging and placement of the material at the CCCDS) in order to have the material placed on Town Neck Beach." **Exhibit 5** at p. 2 of 8.

56. The Corps completed the study (the "§204 Report") in June of this year and the report, in fact, concluded that there was a positive benefit/cost ratio to undertaking a beach nourishment project for Town Neck Beach using the sand dredged from the Canal.

57. In order to protect the 29 shorefront lots on Town Neck Beach, including Plaintiffs' lots, from coastal storm damage and loss, the §204 Report calls for dredging of the Canal by the Corps and a one-time placement of 150,000 cubic yards of sand on Town Neck Beach, which includes the properties owned by the Plaintiffs (the "§204 Project"). The Report analyzes and documents why the greatest beneficial and most effective use of the sand in relation to cost is to place the 150,000 cubic yards on the eroded 2500-foot section of Town Neck Beach. The benefits from this §204 Project would include delaying the loss and damage of the protected properties for the life span of the beach fill, which is five years. The Town agreed to act as the non-Federal sponsor for the §204 Project.

### Permanent Easement Requirement

58. In order to implement the §204 Project, the Town required that certain homeowners who abut Town Neck Beach, including Plaintiffs, "donate" to the Town easements

over their properties *in perpetuity*, despite the fact that the §204 Project would only provide a temporary benefit to these homeowners in the form of one-time sand "dump." A true and correct copy of this letter request by the Town for a permanent easement, dated June 18, 2015, with accompanying easement documents, is attached hereto as **Exhibit 6** . Out of twenty-nine private lots that abut Town Neck Beach, the Town only asked the private property owners of thirteen parcels to relinquish their property rights in perpetuity.

59.     Attached to the Town's June 18, 2015 request of each Plaintiff for a permanent easement is a plan prepared by the Corps in coordination with the Town's consultant, the Woods Hole Group, indicating where the sand would be placed in accordance with the findings of the §204 Report (the "§204 Plan" or "§204 Project"). As authorized by the §204 program, the §204 Plan shows placement of sand on privately owned parcels, including Plaintiffs' properties in order to achieve the optimal design for the §204 Project. *See* **Exhibits 2 and 6**.

60.     The Town's June 18, 2015 letter request that the Plaintiffs donate easements in perpetuity was mailed by certified mail and not received by the Plaintiffs until the week of June 22. The Town's letter requested that the Plaintiffs return the executed Grant of (Permanent) Easement and an executed waiver of Plaintiffs' right to an appraisal of the easement area, to the Town by July 20, 2015. *See* **Exhibit 6**.

61.     The Town's June 18, 2015 request that the Plaintiffs donate easements in perpetuity was the first written communication Plaintiffs had received from the Town indicating that "permanent" easements were now considered necessary to implement the §204 Project.

### Town-Property Owner Permission Agreement

62.     In fact, a year before, in April 2014, the Town had entered into agreements with Plaintiffs for permission and releases with respect to the anticipated §204 Project (the "Town-

Property Owner Permission Agreement") on Town Neck Beach. True and correct copies of the Town-Property Owner Permission Agreement received and agreed to by the Plaintiffs are attached hereto as **Exhibit 7.**

63.     The Town-Property Owner Permission Agreement required permission from Plaintiffs for Town contractors to access Plaintiffs' properties to perform beach nourishment and reconstruction work that would benefit the publicly owned Town Neck Beach, and incidentally benefit Plaintiffs' properties. Such work included the placement of sand on Plaintiffs' properties. Plaintiffs signed the Town-Property Owner Permission Agreement and agreed to its terms because permanent easements were not required by or requested in the Agreement. Plaintiffs agreed to let the Town access their properties at reasonable times to perform the necessary work and place the sand. Plaintiffs relied on the Town's representations that the beach nourishment and reconstruction project would be performed and that this project would benefit their properties. *See* **Exhibit 7.**

64.     In the Town-Property Owner Permission Agreement, the Town acknowledged that beach nourishment is needed for the thirteen private parcels located adjacent to the public Town Neck Beach and that sand placement on these thirteen parcels is "required in order to optimize project performance," but gives no indication that in order to accomplish the beach nourishment program, "permanent" easements in Plaintiffs' properties would be necessary. *See* **Exhibit 7.**

65.     At a general information session for Plaintiffs and other property owners held at the Town Hall on June 29, 2015 by the Town and Corps officials, the Plaintiffs asked the Town officials, with Town legal counsel present, and Corps officials present, to identify and explain the statute, regulation or written policy that required the Plaintiffs to give permanent easements

in their properties in exchange for a one-time placement of beach nourishment sand from the planned dredging of the Cape Cod Canal. Neither the Town's counsel, the Town officials, or the Corps officials could cite to any legal authority for this request.

66. On July 9, 2015, the Board of Selectmen issued a "Public Announcement – Town Neck Beach Easements" ("Public Announcement") in which the Board acknowledged the "imminent danger" to properties on Town Neck Beach and reaffirmed the important public benefit that would result from the implementation of the §204 Project in the location indicated on the §204 Plan. The Board of Selectmen stated in relevant part:

> The beneficial reuse of compatible material from the Canal dredging will help protect numerous properties that are at imminent risk of destruction in light of the amount of erosion that has occurred over the last decade due to major storms, effects of rising seas and climate change, and negative impact of the Canal jetties preventing the natural movement of sand to this area.

> \*       \*       \*

> The Board of Selectmen unanimously believes that completion of the Section 204 Project is critical and in the best interest of the Town, as well as the greater public good. It is our obligation to uphold these interests. We are fully committed and prepared to consider all options that are necessary to make this and future projects happen.

*See* Public Announcement attached hereto as **Exhibit 8.** (Emphasis added.)

### Plaintiffs' Refusal to Donate Permanent Easements

67. Permanent easements over Plaintiffs' properties are not necessary or required to accomplish the §204 Project because temporary easements tied to the duration of the sand-placement project are sufficient. Moreover, there is no legal authority that requires the Town, as the non-Federal sponsor, to acquire any permanent interests in real estate for the purposes of public beaches or access thereto as a condition of federal participation in shore protection projects.

68.     The Town required, in exchange for the placement of the sand, that Plaintiffs "donate" permanent easement rights in their properties.

69.     The Town acknowledged that beach nourishment is needed for the thirteen private parcels located adjacent to the public Town Neck Beach and that sand placement on these thirteen parcels is "required in order to optimize project performance." *See* **Exhibit 7**.

70.     Plaintiffs refused to give the Town permanent easements and explained why in a letter from their attorney to the Town and the Corps dated July 29, 2015, attached hereto as **Exhibit 9**.

71.     As the littoral property owner of Town Neck Beach, the Town cannot condition its obligation to maintain and nourish Town Neck Beach upon a requirement that abutting homeowners relinquish a fundamental property right.

### Corps Deauthorization of §204 Project

72.     At an August 6, 2015 Board of Selectmen meeting, the Town Manager, Mr. George "Bud" Dunham, informed the Board of Selectmen and the public that he had been told orally by the District Office of the Corps that because the Town failed to obtain permanent easements from the Plaintiffs, the Corps was going to "deauthorize" the §204 Project. *See* Affidavit of Paul Schneider attached hereto as **Exhibit 10**.

73.     At the August 6, 2015 Board of Selectmen meeting, the Town Manager explained that the Corps was still willing to provide the Canal-dredged sand to the Town provided the Town paid for 100% of the cost, which would require that the Town expend an additional $1.2 million, for a total of $1.7 million. *See* **Exhibit 10**.

74.     The Corps' deauthorization of the §204 Project meant that the Town was able to place the Cape Cod Canal-dredged sand from the Corps on Town Neck Beach pursuant to the

§204 Plan, without "permanent" easements from homeowners abutting the public beach. In fact, the Construction Plans for the §204 Project were already prepared and could still have been used by the Town to implement the §204 Project, using "temporary easements" from the homeowners. *See* §204 Project Construction Plans attached hereto as **Exhibit 11**.

75. Given the Board of Selectmen's affirmation in its July 9th Public Announcement that the purpose of the §204 Project and Plan was to address the "imminent danger" to properties on Town Neck Beach and the important public benefit that would result from the implementation of the §204 Project in the eroded 2500-foot location indicated on the §204 Plan, the rational decision for the Board to make would have been to request temporary easements of the Plaintiffs and other property owners where sand needed to be placed, and proceed to implement the §204 Project as designed. Instead, the Board and other Town officials turned their anger on the Plaintiffs.

### Town Retaliation for Plaintiffs' Refusal to Donate Permanent Easements

76. At the August 6th Board of Selectman meeting, the Town Manager proposed that the additional $1.2 million be taken from the Community Preservation Act ("CPA") funds, provided the Town's Community Preservation Committee ("CPC") authorized the additional expenditure. *See* **Exhibit 10**.

77. The Town's Community Preservation Committee ("CPC") makes recommendations to the Board of Selectmen ("Board") for the use of Community Preservation Act ("CPA") funds. The CPA is a state law, G.L. ch. 44B, designed to help communities plan ahead for sustainable growth. The CPA allows towns to levy a community-wide property tax surcharge of up to 3% for the purpose of creating a local Community Preservation Fund that can

qualify for state matching funds. The CPA funds must be used to acquire and protect open space, preserve historic buildings and landscapes, and create and maintain affordable housing.

78.     At the August 6th Board of Selectmen meeting, the Chairman of the Board, Mr. Frank Pannorfi, was clear that in light of Corps' deauthorization of the §204 Project, he now wanted the sand to be placed only on the Town's Beach: "I'm going to vote for putting this sand in front of the Town Beach (applause)...." *See* video tape of August 6, 2015 Board of Selectmen meeting, available at http://vp.telvue.com/preview?id=T01161&video=245250 26:31.

79.     At the August 6th Board of Selectmen meeting, at the direction of the Board of Selectmen, the Town Manager proposed that the Town move the location of the sand placement away from the 29 lots on Town Neck Beach to a new location further east, downdrift from the homes in the §204 Project area, on the Town's beach, in the area that fronts a salt marsh. *See* **Exhibit 10**.

80.     At the August 6th Board of Selectmen meeting the Town Manager did not present any beach nourishment "plan" for the new proposed location of the sand, nor any technical, public benefit, or economic justification for placing the sand in front of the salt marsh. He also expressed doubt that 150,000 cubic yards would be a sufficient amount in the new location, which would require the Town to expend further funds to purchase even more sand. *See* **Exhibit 10**.

81.     At the August 12, 2015 meeting of the Board of Selectmen, the Town Manager explained that now that if the Town were to pay 100% of the cost for the dredged sand, it could put it anywhere it pleased, stating:

> The good news is if we do pay 100 percent of the cost, the selectmen as the chief executive officers of the town, have 100 percent control over where that sand gets placed. It doesn't have to go where it was said before, we don't have to put it in front of private property that we need easements for. You can put it all on Town

19

Neck Beach . . . . You would have 100 percent control over where that sand went… if we came up with the 100 percent.

*See* video tape of August 12, 2015 Board of Selectmen meeting, available at

http://vp.telvue.com/preview?id=T01161&video=245250 6:43.

82.     On August 18, 2015, the Town Manager presented the Town's application for $1,250,000 of community preservation funds to the CPC, attached hereto as **Exhibit 12**. The Town's application to the CPC makes no mention of any beach nourishment "plan." It merely states that the sand will now be placed on Town Neck Beach "from Wood Avenue Extension heading east." (*See* **Exhibit 12** at p. 2)

83.     At the August 18, 2015, the Town Manager projected a single Google image of Town Neck Beach upon which he had graphically superimposed a "yellow arrow" showing the new location of where the sand would be placed ("Yellow Arrow Location"). *See* Google graphic from Town Manager presentation attached hereto as **Exhibit 13**.

84.     The Town Manager admitted that the Town had done no benefit/cost analysis to support its proposed new location for placing the sand, stating: "The Town doesn't have hard numbers for the cost-benefit of the new plan. It doesn't have to conduct an analysis since federal funds aren't at play anymore." *See Boston Globe* (digital version, dated August 27, 2015), attached hereto as **Exhibit 14.**

85.     Prior to CPC meeting on August 18, 2015, Stephen Hayes, chairman of the CPC, stated on August 12, 2015 "I don't want one grain of sand going on private property." *See Cape Cod Times* article dated August 13, 2015, attached hereto as **Exhibit 15**.

86.     Mirroring the view of the Board of Selectmen, former Town Selectman James Pierce stated: "All of the sand in question will be placed to the east of those who did not sign [the permanent easements]. As time passes that sand will move further east. Not one teaspoon

of it will move back west toward those who did not sign... I repeat, not one grain of sand will benefit those who did not sign." *See* Pierce Facebook Post attached hereto as **Exhibit 16**.

87.     Under such obvious pressure from the Board of Selectmen, on August 18, 2015, without any plan in front of it except the statement that the sand would be placed "from Wood Avenue Extension heading east," the CPC approved the use of additional CPA funds from the Community Preservation Budget needed to cover 100% of the cost of purchasing the sand.

## Approval of Use of CPC Funds without Specific Plan

88.     On August 31, 2015, at a Special Town Meeting, the CPC appropriation of funds was approved by warrant, whose language did not even reference the new location for the placement of the sand.  It merely stated:

> To see if the Town will vote to appropriate under the Community Preservation Act – open space and recreation program, the sum of $1,250,000, or any other amount, to be expended under the direction of the Board of Selectmen, for the purpose of designing and constructing a beach renourishment, restoration and resiliency project on Town Neck Beach, including professional services, and any other costs incidental and related thereto. . .

The Special Town Meeting motion contained the same language.  The warrant and motion are attached hereto as **Exhibit 17**.

89.     The reason that the Special Town Meeting was worded without reference to the new location for the placement of sand was because there was <u>no</u> plan to reference.

90.     The Chairman of the Board of Selectmen, Mr. Frank Pannorfi, acknowledged that anger toward the Plaintiffs for refusing to donate permanent easements was a key motivating factor behind the Town Meeting decision. *See* article from *The Sandwich Enterprise* dated September 4, 2015, attached hereto as **Exhibit 18**.

## §204 Report and Town's Consultant Contradict Proposed Location for Sand

91.    The placement of sand at the new location in lieu of the original location set forth in the §204 Plan is contradicted by the Corps' §204 Report that explains why the up-drift location of Town Neck Beach, just after the Canal, is the correct location. Specifically, the §204 Report states:

- **Best Practice:** Providing sand at the most up drift location, closest to the Cape Cod Canal, makes the most sense from a coastal processes standpoint, because sand placed on Town Neck Beach would provide protection to down drift beaches such as Spring Hill Beach. (Page ES-1).

- **Preventing Loss of Property:** The Town Neck Beach area includes 29 shorefront lots and 7 structures that would be damaged or lost within the next five years if the sand is not placed pursuant to the §204 Project plan. (Page ES-2). The value of land that would be lost to erosion at 2,500 Linear Feet x (5 Feet Per Year of Erosion) = 12,500 Square Feet per Year x ($17.00 per Square Foot) = $212,500 per Year in lost property value, or $1,062,500 in lost property value over the next 5 years. (Page 16)

- **Health and Safety:** If the sand is not placed at the most up drift location on Town Neck Beach, there is risk of potential collapse of roads in the Project area—Town Neck Road, the main emergency evacuation route for the Town. Damage to Town Neck Road and Freeman Avenue could isolate those not evacuated prior to a storm event. (Page 5)

- **Avoidance of Infrastructure Costs.** Infrastructure replacement cost for Town Neck Road is estimated at $3.9 million. (Page 5)

- **Prevention of Damages.** The Project, as proposed, will result in the prevention of annualized damages of approximately $815,000. (Page 8)

- **Net Benefit to Taxpayers.** The Cost-Benefit analysis for the Project indicates a net annual benefit to taxpayers of $449,015, which equates to a taxpayers' benefit of $2,245,000 over the 5-year lifespan of the Project. (Page 17).

*See* **Exhibit 4.**

92.    There are more specific reasons why the placement of the sand east of the Wood Avenue Extension is contrary to best practice, and would have unintended negative consequences. Specifically:

- A large volume of sand placed adjacent to the Sandwich Harbor inlet as indicated by the Yellow Arrow Location on the Town Manager's graphic slide (See **Exhibit 13**) will readily move alongshore into the Sandwich Harbor inlet which will cause shallowing and shifting of the inlet. This could create a hazard to navigation and could choke off the Sandwich Harbor inlet opening

- The Yellow Arrow Location which will place sand on a portion of the barrier beach dune in front of the salt marsh, has been justified as protecting the Sandwich downtown from flooding. However, the greatest potential for Sandwich downtown to be flooded would be as a result of a coastal storm surge.

- The dunes in the Town Parking lot area of Town Neck Beach that comprise more than half of the Yellow Area Location (which is 0.4 miles long) are already managed and cultivated, so they presently have a nearly continuous, high dune that is effective in reducing coastal wave and overwash impacts.

- There is approximately 0.6 miles of barrier beach further east of the Yellow Arrow Location that is located <u>outside</u> the Town's "Full Reconstruction Project" at the east end of Town Neck Beach and on Spring Hill Beach (the other side of Sandwich Harbor Inlet), that is natural and not managed. This additional 0.6 mile natural barrier beach also fronts on the same salt marsh and tidal creek system connecting to Sandwich downtown as the Town Neck Beach. Because this natural barrier beach is not managed, it has irregular low dunes with many channels and sand flats that readily overwash in a major storm.

- It is the 0.6 mile natural barrier beach located outside the Town's Full Reconstruction Project Area that is the most likely area to overwash with resulting flooding of the Sandwich downtown.

- Placing the 150,000 cubic yards of sand in the Yellow Arrow Location on Town Neck Beach is the area where the placement of sand would be the least effective in preventing flooding. Adding sand to the most stable and protected area (Yellow Arrow Location), while not addressing the 0.6 mile barrier beach area fronting on the same harbor that already frequently overwashes, is not an effective strategy to protect the Sandwich downtown from flooding.

- Placing sand on the 0.6 mile natural barrier beach segment is not a better alternative than placing it on the original §204 Project area where it would protect homes. Moreover, the placement of sand on this 0.6 mile natural barrier is not possible without review and further permitting by federal, state, and local authorities, including the U.S. Army Corps of Engineers, the Environmental Protection Agency, the Massachusetts Department of Environmental Protection, the Massachusetts Department of Fish and Game, and the Sandwich Conservation Commission.

*See* affidavit of Peter S. Rosen, Ph.D, attached hereto as **Exhibit 19**.

## Hastily Prepared Plan for New Location of Sand

93.     According to the Town Manager, the Town must deposit the $1.7 million in the account of the Corps in order to secure the 150,000 cubic yards of sand for placement. *See* **Exhibit 12**, p. 2. So even if a plan is prepared by the Town's consultant, it will only be a hastily prepared "plan to place sand" and not a plan whose prioritization over the §204 Project location can be justified on a technical, coastal processes basis, or public benefit grounds, compared to the §204 Project's ability to prevent and/or delay the predicted serious damage to public and private property and Town infrastructure from future storm events.

94.     The Town is obligated to use the CPA funds in a way to best benefit the public, regardless of whether private property owners receive an incidental benefit. The change in the location of the sand placement by the Town, however, is based on nothing more than intense resentment toward Plaintiffs for not "donating" permanent easements for this temporary sand placement project.

95.     With respect to the §204 Project, the Town and the Corps were prepared to enter into a Project Partnership Agreement ("PPA"). The PPA sets forth the obligations of each party with respect to the Project. The PPA is attached hereto as **Exhibit 20**.

96.     As set forth in the PPA, the Town could have paid 100% of the §204 Project costs pertaining to the privately owned properties and still paid only 35% of the total Project cost under the Town-Corps Project Partnership Agreement (PPA). Article II.C of the PPA states:

> C. The Non-Federal Sponsor shall contribute 35 percent of *total project costs* assigned by the Government to hurricane and storm damage reduction, plus 50 percent of *total project costs* assigned by the Government to recreation, plus 100 percent of *total project costs* assigned by the Government to privately owned shores (where use of such shores is limited to private interests) in accordance with the provisions of this paragraph.

*See* **Exhibit 20**.

97.    Given the Corps' estimate that the placement of sand on the privately owned shores would constitute approximately 10% of the §204 Project, the 100% cost to the Town would have been less than $150,000 (which Plaintiffs offered to pay), instead of the additional $1.2 million that the CPC authorized. Neither the Corps nor the Town expressed any interest in receiving the payment proffered by Plaintiffs as a means to achieve a practical solution to the impasse over the permanent easement issue. As a result, the Town is now forced to fund 100% of the *total* Project costs—$1.7 million. *See* **Exhibit 12**.

98.    Plaintiffs were, and remain, willing to grant temporary easements to the Town for sand placement, and to pay their proportionate share of the cost of the sand. In fact, giving the Town "temporary" permission to come onto their properties for the §204 Project in 2015-2016 is precisely what Plaintiffs thought they were doing when they signed the Town-Property Owner Permission Agreement that was sent to them by the Department of Natural Resources in April of 2014. *See* **Exhibit 7**.

99.    The Town has taken virtually no action to address the erosion issues at Town Neck Beach. The §204 Plan sets forth the most beneficial and cost effective method for restoring this public beach. The Town now has the opportunity and resources to address and remediate erosion, however, it is withholding such nourishment and restoration efforts to the detriment of taxpayers and the public in retaliation for Plaintiffs not giving the Town permanent easement rights, despite the fact that permanent easements are no longer necessary, that temporary easements are sufficient to implement the §204 Project, and that Plaintiffs are willing to pay for the portion of the sand actually placed on their properties.

100.    The retaliatory action of the Town toward Plaintiffs because the Town must now pay for 100% of the sand from the Canal dredging is palpable in light of the fact that the Town

had always been willing to pay 100% of the cost of obtaining the dredged material for the eroded 2500-foot stretch of Town Neck Beach where Plaintiffs' homes are. *See* **Exhibit 5** at p. 2 of 8.

### The Consequences of the Town's Actions and Inactions

101.  The likely outcome of the Town's spiteful actions is dire. Another major storm event will further accelerate the erosion process on Town Neck Beach. In addition to the imminent damage that will be caused to the public beach as a result, Plaintiffs will be at risk for further significant damages to their properties including, but not limited to, the undermining of their homes' foundations and destruction of septic systems which could make their homes uninhabitable.

102.  The severe storm events that caused extensive damage to Town Neck Beach and abutting coastal structures between 2012 and 2015 and resulted in the estimated loss of 45,550 cubic yards of native and borrow coastal bank/coastal dune material, calculated at a replacement cost of $30.00 per cubic yard, results in a cost to replace the lost land of approximately $1,400,000.

103.  As a result of the extensive erosion from the severe storm events between 2012 and 2015, the market value of Plaintiffs' properties has decreased by approximately $2,500,000, and continues to decrease, as a result of the eroding shoreline of Town Neck Beach, and the Town's failure to undertake and maintain a program of beach nourishment on its public beach.

104.  Plaintiffs have been forced to undertake substantial measures to protect their properties, but these measures have not been enough. Plaintiffs have incurred a total cost of over $600,000 to purchase and place "sacrificial" sand in front of their properties, most of which has now been lost to the storm events that have occurred between 2012 and 2015.

## COUNT I

### (Certiorari)

105.     Plaintiffs restate the allegations of paragraphs 1 through 104, and incorporate them herein.

106.     The Town's action on August 31, 2015 in determining that the sand provided by the Corps should not be placed on the portion of Town Neck Beach abutting Plaintiffs' property, but away from the Plaintiffs' properties, further east on Town Neck Beach, is subject to certiorari review because it is a programmatic governmental decision best suited for certiorari review and Plaintiffs have no other adequate remedies.

107.     The Town's decision to use public funds to place the sand provided by the Corps on a different portion of Town Neck Beach and not on the portion of Town Neck Beach as set forth in the §204 Plan, despite overwhelming evidence indicating that this is the most beneficial location for the placement of sand, creates a substantial injury or injustice to Plaintiffs which they have not been able to resolve by use of administrative remedies available to them.

108.     The Town has committed an error of law and an abuse of discretion and has acted arbitrarily and capriciously against Plaintiffs because Plaintiffs refused to relinquish property rights in the form of permanent easements as a "donation" to the Town.  This Court should therefore rule that the sand provided by the Corps to the Town should be placed on Town Neck Beach in accordance with the §204 Plan.

109.     The Town's actions and inactions have resulted in, and continue to result in, loss of public property and of Plaintiffs' properties as a result of accelerated erosion along Town Neck Beach.

## COUNT II

### (Declaratory Judgment)

110. Plaintiffs restate and reallege the allegations of paragraphs 1 through 109 of their Complaint.

111. An actual controversy exists between the parties regarding Plaintiffs' right, title and interest to land.

112. An actual controversy also exists between the parties concerning Defendants' obligations to maintain, restore, and nourish Town Neck Beach.

113. Pursuant to Mass. Gen. Laws. G.L. c. 185, §1(k) and Mass. Gen. Laws. c. 231A, §1 *et seq.*, this Court should enter a binding Judgment and rule that the Town is obligated to maintain, restore, and nourish Town Neck Beach by the method most beneficial and cost effective to the public, and that the sand provided by the Corps to the Town must be placed on Town Neck Beach in accordance with the §204 Plan, without the requirement of permanent easements, in order to prevent the further loss of public property and Plaintiffs' properties resulting from accelerated erosion.

## COUNT III

### (Breach of Contract)

114. Plaintiffs restate and reallege the allegations of paragraphs 1 through 113 of their Complaint.

115. Plaintiffs entered into the Town-Property Owner Permission Agreement with the Town.

116. Plaintiffs have duly performed their obligations under the this Agreement.

117.  The Town is in material breach of the Town-Property Owner Permission Agreement and has failed to perform under the Agreement.

118.  As a result of the Town's breach of the Town-Property Owner Permission Agreement, Plaintiffs have sustained substantial damage to their properties.

## COUNT IV

### (Promissory Estoppel)

119.  Plaintiffs restate and reallege the allegations of paragraphs 1 through 118 of their Complaint.

120.  The Town agreed to provide beach nourishment to Plaintiffs through the placement of sand on Plaintiffs' properties.

121.  Plaintiffs reasonably relied upon such representations by the Town.

122.  Reliance by Plaintiffs was foreseeable by the Town.

123.  As a result of Plaintiffs' reliance on the Town's representations, Plaintiffs have suffered substantial damage to their properties, or otherwise suffered substantial detriment.

## COUNT V

### (Specific Performance)

124.  Plaintiffs restate and reallege the allegations of paragraphs 1 through 123 of their Complaint.

125.  The Town entered into binding obligations to Plaintiffs through the Town-Property Owner Permission Agreement

126.  The Town breached its obligations under the Town-Property Owner Permission Agreement.

127. Plaintiffs are entitled to enforce those obligations under the Town-Property Owner Permission Agreement because money damages will be inadequate compensation to redress the damage to Plaintiffs' properties.

## COUNT VI

### (Violation of the Unconstitutional Conditions Doctrine)

128. Plaintiffs restate and reallege the allegations of paragraphs 1 through 127 of their Complaint.

129. The Town conditioned Plaintiffs receiving beach nourishment upon the requirement that Plaintiffs donate to the Town easements *in perpetuity* over their properties.

130. Plaintiffs refused to relinquish this fundamental property right; therefore, the Town denied Plaintiffs the benefit of beach nourishment.

131. Permanent easements are not necessary or required in order for the Town to provide beach nourishment to Plaintiffs.

132. Government cannot condition the provision of a discretionary benefit, such as beach nourishment, on a person giving up a constitutionally protected right, which includes a property right.

133. The Town's actions in withholding beach nourishment from Plaintiffs because Plaintiffs would not relinquish their property rights is in violation of the Fifth and Fourteenth Amendments to the Massachusetts and United States Constitutions.

134. Plaintiffs have been damaged by the deprivation of their constitutional rights.

# COUNT VII

## (Injunctive Relief)

135.    Plaintiffs restate and reallege the allegations of paragraphs 1 through 134 of their Complaint.

136.    The continued failure and refusal of the Town provide beach nourishment and restoration to the 2500-foot area of Town Neck Beach as shown on the §204 Plan is contrary to Plaintiffs' rights and interests in their properties on Town Neck Beach.

137.    The Town's arbitrary, capricious and spiteful decision to place sand at an alternative location on Town Neck Beach further east on Town property, instead of placing the sand at the original location on Town Neck Beach pursuant to the §204 Plan, is contrary to Plaintiffs' rights and interests in their properties on Town Neck Beach.

138.    The Town's actions are detrimental to Plaintiffs' rights and interests in their properties and the Town's actions have caused, and continue to threaten, irreparable harm upon Plaintiffs and their rights and interests.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs request this Court to:

1. Enter judgment against Defendants on all counts of this Complaint;

2. Enter a preliminary injunction prohibiting, enjoining and restraining Defendants from placing sand on Town Neck Beach east of the Wood Avenue Extension during the pendency of this litigation;

3. Enter judgment declaring that that the sand provided by the Corps to the Town shall be placed on the portion of Town Neck Beach as set forth in the §204 Plan, without the requirement of permanent easements;

4. Order the Town to comply with the terms and obligations contained within the Town-Property Owner Permission Agreement, including, but not limited to, placement of sand on Plaintiffs' properties for the purpose of beach nourishment and restoration;

5. Enter a permanent injunction prohibiting, enjoining and restraining Defendants from placing sand on Town Neck Beach east of the Wood Avenue Extension, and requiring Defendant to place the sand provided by the Corps to the Town on the location of Town Neck Beach defined in the §204 Plan; and

6. Grant such further relief as may be equitable and just.

PLAINTIFFS,
By their Attorney,

Brian W. Blaesser (BBO #636114)
bblaesser@rc.com

Danielle Andrews Long (BBO #646981)
dlong@rc.com
**Robinson + Cole LLP**
One Boston Place, Floor 25
Boston, MA 02108-4404
(617) 557-5900

Dated: 9/24/15

## VERIFICATION

I, Paul G. Joubert, being duly sworn, depose and say that I have read the foregoing Complaint and know of its contents; that the facts stated therein are true to my own knowledge except as to those matters therein stated to be alleged upon information and belief, and as to those matters I believe them to be true, and that no material facts have been omitted, and that I hereby verify this Complaint.

Signed under the penalties of perjury this **28** day of _August_, 2015.

_Paul G. Joubert_
Paul G. Joubert

# VERIFICATION

I, Beverly Hand, being duly sworn, depose and say that I have read the foregoing Complaint and know of its contents; that the facts stated therein are true to my own knowledge except as to those matters therein stated to be alleged upon information and belief, and as to those matters I believe them to be true, and that no material facts have been omitted, and that I hereby verify this Complaint.

Signed under the penalties of perjury this 28 day of August , 2015.

_____
Beverly Hand

## <u>VERIFICATION</u>

I, Jeanne Ekasala, being duly sworn, depose and say that I have read the foregoing Complaint and know of its contents; that the facts stated therein are true to my own knowledge except as to those matters therein stated to be alleged upon information and belief, and as to those matters I believe them to be true, and that no material facts have been omitted, and that I hereby verify this Complaint.

Signed under the penalties of perjury this 28 day of August, 2015.

Jeanne Ekasala

Jeanne Ekasala

## <u>VERIFICATION</u>

I, Pasquale Teti, Trustee of the 5 White Cap Path Realty Trust, being duly sworn, depose and say that I have read the foregoing Complaint and know of its contents; that the facts stated therein are true to my own knowledge except as to those matters therein stated to be alleged upon information and belief, and as to those matters I believe them to be true, and that no material facts have been omitted, and that I hereby verify this Complaint.

Signed under the penalties of perjury this 14th day of Sept, 2015.

Pasquale Teti, Trustee of the 5 White Cap
Path Realty Trust

## VERIFICATION

I, Pasquale Teti, as Trustee of the White Cap Condominium Association, being duly sworn, depose and say that I have read the foregoing Complaint and know of its contents; that the facts stated therein are true to my own knowledge except as to those matters therein stated to be alleged upon information and belief, and as to those matters I believe them to be true, and that no material facts have been omitted, and that I hereby verify this Complaint.

Signed under the penalties of perjury this ___4th___ day of ___Sept___, 2015.

Pasquale Teti, Trustee

## VERIFICATION

I, Maureen L. Sheehan, as Trustee of the Maureen L. Sheehan Trust, being duly sworn, depose and say that I have read the foregoing Complaint and know of its contents; that the facts stated therein are true to my own knowledge except as to those matters therein stated to be alleged upon information and belief, and as to those matters I believe them to be true, and that no material facts have been omitted, and that I hereby verify this Complaint.

Signed under the penalties of perjury this _2_ day of _September_, 2015.

Maureen L. Sheehan, Trustee

## VERIFICATION

I, Paul Schneider, as Trustee of the Diane Realty Trust, being duly sworn, depose and say that I have read the foregoing Complaint and know of its contents; that the facts stated therein are true to my own knowledge except as to those matters therein stated to be alleged upon information and belief, and as to those matters I believe them to be true, and that no material facts have been omitted, and that I hereby verify this Complaint.

Signed under the penalties of perjury this 28 day of August, 2015.

_Paul Schneider Tru_
Paul Schneider, Trustee

## VERIFICATION

I, Sharon Schneider, as Trustee of the Diane Realty Trust, being duly sworn, depose and say that I have read the foregoing Complaint and know of its contents; that the facts stated therein are true to my own knowledge except as to those matters therein stated to be alleged upon information and belief, and as to those matters I believe them to be true, and that no material facts have been omitted; and that I hereby verify this Complaint.

Signed under the penalties of perjury this _28_ day of _August_, 2015.

_Sharon Schneider_
Sharon Schneider, Trustee

## VERIFICATION

I, Vasilios Poulos, as Trustee of the Vasilios Poulos Revocable Intervivos Trust, being duly sworn, depose and say that I have read the foregoing Complaint and know of its contents; that the facts stated therein are true to my own knowledge except as to those matters therein stated to be alleged upon information and belief, and as to those matters I believe them to be true, and that no material facts have been omitted, and that I hereby verify this Complaint.

Signed under the penalties of perjury this 29 day of August, 2015.

_____
Vasilios Poulos, Trustee

## **VERIFICATION**

I, Irene Davis, being duly sworn, depose and say that I have read the foregoing Complaint and know of its contents; that the facts stated therein are true to my own knowledge except as to those matters therein stated to be alleged upon information and belief, and as to those matters I believe them to be true, and that no material facts have been omitted, and that I hereby verify this Complaint.

Signed under the penalties of perjury this 30 day of August , 2015.

_____
Irene Davis

# VERIFICATION

I, Darrell Davis, being duly sworn, depose and say that I have read the foregoing Complaint and know of its contents; that the facts stated therein are true to my own knowledge except as to those matters therein stated to be alleged upon information and belief, and as to those matters I believe them to be true, and that no material facts have been omitted, and that I hereby verify this Complaint.

Signed under the penalties of perjury this **30** day of _August_, 2015.

Darrell Davis

# VERIFICATION

I, Paul Schneider, President and duly elected member of the Managing Board of the Sandwich Shores Condominium Association, being duly sworn, depose and say that I have read the foregoing Complaint and know of its contents; that the facts stated therein are true to my own knowledge except as to those matters therein stated to be alleged upon information and belief, and as to those matters I believe them to be true, and that no material facts have been omitted, and that I hereby verify this Complaint.

Signed under the penalties of perjury this 12th day of September, 2015.

_Paul Schneider Pres_

Paul Schneider, President of the
Managing Board of the Sandwich
Shores Condominium Association